UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

MICHAEL YOUNG                                              CIVIL ACTION

VERSUS                                                     NUMBER: 16-03404

SANDY MCCAIN, ET AL.                                       SECTION: "I"(5)

**REPORT AND RECOMMENDATION**

Presently before the Court is the Rule 12(b)(6) motion to dismiss of the Defendants herein, Warden W.S. "Sandy" McCain ("McCain"), Major Tim Crawford ("Crawford"), Dr. Matthew Gamble ("Gamble"), and Amy Stogner ("Stogner"), whom Plaintiff identifies as a Social Worker. (Rec. doc. 31). Plaintiff filed a memorandum in opposition to Defendants' motion. (Rec. doc. 35). Prior to filing that opposition memorandum, Plaintiff also filed a motion for leave to file a second amended complaint (rec. doc. 33), to which the Defendants have now responded. (Rec. doc. 36). By way of the latter motion, Plaintiff seeks to amend his 24-page original complaint (rec. doc. 4) and six-page first amended complaint (rec. doc. 13) with a superseding, supplemental 24-page pleading. (Rec. doc. 33-1). Plaintiff's motion for leave to file a second amended complaint is hereby granted. For the reasons that follow, it is recommended that the Defendants' motion be granted and that Plaintiff's suit be dismissed.

Michael Young, Plaintiff herein, is an inmate at the B.B. "Sixty" Rayburn Correctional Center ("RCC") in Angie, Louisiana. As reflected by his second amended complaint,[1] a 24-

---

[1] Because Plaintiff's second amended complaint does not specifically refer to and adopt or incorporate by reference his original and first amended complaints, the second amended complaint supersedes those earlier two pleadings and renders them of no legal effect. *Eason v. Holt*, 73 F.3d 600, 603 (5th Cir. 1996); *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994).

page pleading containing 102 numbered paragraphs that the Court is hard-pressed to characterize as presenting the short and plain statement required by Rule 8(a), Fed. R. Civ. P., the following factual allegations can be summarized.

Plaintiff alleges that on September 3, 2015, he requested to be placed on suicide watch as a result of experiencing grief over his mother's declining health and was transferred to the RCC's "Sleet Unit" where he was placed on standard suicide watch ("SSW"). While "unattended" on SSW, Plaintiff states that he jumped from the sink in his cell to the bed frame and began banging his head. As a result of this behavior, Plaintiff indicates that Stogner placed him on extreme suicide watch ("ESW") in 2-point restraints on the order of Dr. Casey McVea, the RCC physician. The following day, and despite Plaintiff's professed suicidal ideations, he alleges that Stogner "downgraded" him to SSW and so advised Lieutenant Rigdon, who transported Plaintiff to the shower area to remove his restraints. Upon being returned to his cell, Plaintiff states that, according to a disciplinary report that was generated as a result of the incident,[2] he climbed on the toilet and threatened to jump headfirst from it again. Upon being informed of his behavior, Dr. McVea once again "upgraded" Plaintiff to ESW, on which he remained until September 8, 2015.

On September 8, 2015, Plaintiff, who was still on 2-point ESW, was downgraded to SSW by Stogner. As reportedly set forth in another disciplinary report, Plaintiff ran into a wall and, after being escorted to the lobby, began banging his head on the wall in front of Stogner. Plaintiff was accordingly allegedly upgraded to ESW by Dr. McVea where he remained until September 13, 2015. The following day, Stogner downgraded Plaintiff to SSW

---

[2] While Plaintiff does not specifically so state, the Court surmises that his actions violated an applicable RCC rule prohibiting inmates from engaging in acts of self-mutilation and other acts of self-harm.

2

again who thereafter proceeded to jump from the toilet to the bed, allegedly landing on his right side. This resulted in Plaintiff being upgraded back to ESW.

According to yet another disciplinary report, on September 15, 2015, while still on ESW, Plaintiff began to bang his head against the steel bunk in his cell and was thus made to wear a protective helmet. While so attired, Plaintiff was escorted to the "B" Building where he was interviewed by videoconferencing means by Gamble, the RCC psychiatrist, who ultimately concluded that Plaintiff's recent behavior was the result of his "character." Thereafter, Plaintiff was returned to Sleet Unit. The following day, at the direction of another jailer, an "inmate counsel substitute" named Gary Jones ("Jones") appeared in Plaintiff's cell for the purpose of reading him 16 disciplinary reports which had been lodged against him, the contents of which Plaintiff claims he was unable to focus on owing to his mental state. Plaintiff at that time learned that McCain had ordered disciplinary proceedings on the 16 reports to go forward the following day because Gamble had found him competent to so proceed.

On September 17, 2015, Plaintiff was brought to the Sleet 4 lobby and placed in the lieutenant's office where Major Crawford and Lisa Ard attended via videoconference. After counsel substitute Jones entered "not guilty" pleas to the disciplinary charges and Plaintiff's request for a continuance of the proceeding was denied, he was found guilty of all 16 prison rules violations after admittedly receiving separate hearings on each of the charges. That resulted in Plaintiff being sentenced to 60 days of isolation, the loss of 540 days of "good time" credits, and his transfer to level-one extended lockdown.[3]/ Plaintiff indicates that he

---

[3]/ In paragraph 36 of his second amended complaint, Plaintiff makes clear that he "… is only addressing the isolation, also known as disciplinary detention and improper notice because the plaintiff has already went (sic)

was unable to appeal his disciplinary conviction as a result of being on suicide watch but admits that Jones did so on his behalf, albeit without input from Plaintiff. Administrative remedies were reportedly denied by Warden McCain.

Some time thereafter, Plaintiff alleges that he was visited by another inmate counsel substitute, George Wade, who opined that Plaintiff had not been treated fairly in the earlier disciplinary proceedings and that he had been improperly downgraded from ESW to SSW by Stogner. Plaintiff alleges that Wade obtained permission from a prison official to litigate that matter through RCC's Administrative Remedy Procedure ("ARP"), on which Plaintiff indicates he was inadequately consulted due to his custodial classification. At this point in his amended pleading, Plaintiff digresses to discuss incidents that reportedly occurred in 2014, in which he declined to take psychiatric medication that had been recommended by an unidentified physician and Stogner, resulting in his being placed on SSW by the doctor and being downgraded to mental health observation ("MHO") by Stogner once he began taking the medication. Approximately 10 days later, the physician thought that Plaintiff was not taking the medication due to some "mix-up" and returned him to SSW.

Continuing, Plaintiff claims to have had many discussions with Stogner about his suicide attempts, with Stogner saying she did not like it that Plaintiff was "high" all the time. Plaintiff alleges that in August of 2015, he communicated with Stogner repeatedly about the decline in his mother's health and requested to be seen by Gamble to be placed on medication, to no avail. As a result of those reported unsuccessful attempts, he requested to be placed on suicide watch when suicidal ideations occurred. Plaintiff charges Stogner with

---

to state court for Judicial Review concerning his loss of good time because his good time case do not affect this case because they are separate." (Rec. doc. 33-1, p. 8).

4

being deliberately indifferent to his need for self-protection by downgrading him from ESW to SSW on the three occasions noted above, all when Lieutenant Rigdon was on duty, resulting in Plaintiff receiving multiple prison-rules violations. He also cites an RCC health-care policy which provides that such action may be taken only by a "mental health professional" or "physician." Over the years, Plaintiff reports requesting medical attention, being written up for malingering, going on hunger strikes, being sent to the hospital, and being seen by multiple doctors for an exacerbation of a shoulder injury he had sustained as a result of a December 14, 2013 gunshot wound.

Plaintiff goes on to allege that Stogner and Gamble were deliberately indifferent to his serious mental-health needs, with Gamble being aware of Plaintiff's past history of suicidal ideations since 2013. Plaintiff recalls his transfer from Elayn Hunt Correctional Center ("EHCC") to RCC in 2014, following which Gamble reportedly took him off medication at his request. However, at some point in 2015, Plaintiff requested, through Stogner, that Gamble put him back on medication. According to Plaintiff, he was subsequently interviewed by Gamble via videoconferencing during which he alleges to have told the doctor of his mother's health issues and his own psychiatric history. Instead of providing him needed treatment, Plaintiff alleges that Gamble accused him of drug-seeking behavior. Plaintiff states that he complained of these occurrences to another social worker named Floyd who proceeded to place Plaintiff on suicide watch on September 3, 2015.

Plaintiff complains of the frequency and manner of his interactions with Gamble and the lack of an on-site psychiatrist at RCC. He also challenges Gamble's finding that he was competent to appear at the September 17, 2015 disciplinary proceeding as not being based on "adequate professional judgment" because the decision was made following an interview

5

that was conducted via videoconferencing. As for Crawford, Plaintiff alleges that he allowed the purportedly unconstitutional disciplinary hearing to go forward by not granting a continuance. McCain, for his part, failed to overturn the results of the allegedly flawed disciplinary proceedings. While housed on the disciplinary tier following his conviction, Plaintiff also complains that he was disallowed bedding materials from 5:00 a.m. to 8:30 p.m. and was provided only minimal clothing. For the alleged violations of his constitutional rights, Plaintiff seeks declaratory and injunctive relief regarding Stogner's downgrading of his mental-health status, the making of competency determinations by Gamble via videoconferencing means, and the conducting of disciplinary proceedings by McCain and Crawford with respect to inmates on ESW or SSW. Plaintiff also seeks compensatory and punitive damages.

In their present motion, the Defendants argue that they are entitled to qualified immunity with respect to Plaintiff's allegations of deliberate indifference to his serious medical needs and those regarding the validity of the disciplinary proceedings that were taken against him. The doctrine of qualified immunity provides governmental officials performing discretionary functions with a shield against damages for civil liability, provided that their actions could reasonably have been thought to be consistent with the rights they are alleged to have violated. *Gobert v. Caldwell*, 463 F.3d 339, 345 (5th Cir. 2006)(citing *Anderson v. Creighton*, 483 U.S. 635, 638, 107 S.Ct. 3034, 3038 (1987)). In determining whether a governmental official is entitled to qualified immunity, the appropriate inquiry is: 1) whether the plaintiff has demonstrated a violation of a clearly established federal right <u>and</u> 2) whether the official's actions violated that right to the extent that an objectively reasonable person would have known. *Id.* (citing *Hope v. Pelzer*, 536 U.S. 730, 122 S.Ct. 2508

(2002)). Those two prongs may be considered in either order. *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S.Ct. 808, 818 (2009). Once raised, the plaintiff bears the burden of rebutting the qualified immunity defense by establishing that the official's allegedly wrongful conduct violated clearly established law. *Gobert*, 463 F.3d at 345 (quoting *Estate of Davis v. N. Richard Hills*, 406 F.3d 375, 380 (5th Cir. 2005)).

Plaintiff's allegations in the present case can be fairly grouped into two categories: those respecting the adequacy of the medical care he received at RCC and those regarding the validity of the disciplinary proceedings that went forward on September 17, 2015. With respect to the former set of allegations, and in an effort to better understand the extent and nature of the medical treatment Plaintiff has received, the Court previously issued an order that it, as well as Plaintiff, be provided with a copy of Plaintiff's medical records. (Rec. doc. 37). That has now been accomplished.[4] A summary of those records pertinent to the resolution of the matter at hand follows.

Among a whole host of other medical conditions, the records that have been provided to the Court reveal that Plaintiff suffered multiple gunshot wounds prior to being incarcerated, with one such projectile remaining lodged in his throat and fragments of a bullet being present in his right shoulder after shattering his collarbone. (III, pp. 230, 367; IV, p. 248).[5] On March 18, 2014, Dr. McVea issued an "Offender Duty Status" with respect to

---

[4] The Court has been furnished with a hard copy of the records as well as a copy of said records on a disc. In the latter medium, the documents have been grouped into four "pdf" folders, each of which will hereinafter be identified by a roman numeral followed by the page number of the document appearing in that particular folder. Plaintiff's mental health records make up the first "pdf" folder. Although some of the records are duplicates, they total a substantial 1,478 pages in length.

[5] In records which pre-date the events at issue in this lawsuit, Plaintiff had complained about the foreign body that was lodged in his neck but declined surgical removal when he was seen by Dr. McVea on October 30, 2014. (IV, p. 74). By February 26, 2015, Plaintiff had changed his mind and asked that the bullet be removed. (IV, p. 72). There is no indication in the records if this extraction was carried out.

Plaintiff, placing him on regular duty status with restrictions against the use of his right hand and avoidance of contact sports, outdoor sports (with exception), and weight lifting. (IV, p. 125).

Closer in time to the events at issue in this lawsuit, on September 2, 2015, the day before he was placed on SSW, Plaintiff was observed on the "Sun Yard" playing basketball with both his left and right hands, contrary to his duty status. (IV, p. 337). He was thus charged with aggravated disobedience. (*Id.*). Notice of that rule violation was apparently provided to the RCC Medical Department which, on September 3, 2015, re-classified Plaintiff's status to regular duty with no restrictions. (IV, p. 336; III, p. 327).

Subsequent to being placed on suicide watch on September 3, 2015, the medical records indicate that Plaintiff's condition was monitored periodically on a 24-hour basis for the next several days. (IV, pp. 333-335). On September 8, 2015, some five days after initially being placed on suicide watch, Plaintiff completed a "Health Care Request Form" in which he complained that "my shoulder feels like a bone[']s broken" and "chest pains." (IV, p. 335). Upon being seen by medical personnel, Plaintiff complained of pain to the right shoulder area after jumping from the sink to the floor of his cell several days earlier, pain which exacerbated his previous gunshot injury. (*Id.*). Plaintiff was noted to laugh and talk during the clinic visit. (*Id.*). In light of Plaintiff's complaint of chest pain, an EKG was performed which revealed normal sinus rhythm. (III, p. 351). Findings from the examination and Plaintiff's medical chart were provided to Dr. McVea who issued no healthcare orders. (IV, p. 335).

On September 9, 2015, while still on suicide watch, Plaintiff apparently hit his head on the wall several times but experienced no loss of consciousness and subsequently denied

available medical care. (III, p. 97). Plaintiff was then returned to suicide watch where he continued to be monitored. (IV, p. 332). On September 10, 2015, he submitted another "Health Care Request Form" complaining of pain to the right shoulder. (IV, p. 331). Although some swelling to the right side of the collar bone was noted upon examination by the attending EMT, Plaintiff was simply instructed to make further sick-call requests as needed as he was in no apparent distress. (*Id.*). Around this time, Plaintiff began a self-declared hunger strike, resulting in his condition being monitored even more closely. (IV, pp. 330, 328). Nevertheless, Plaintiff was in good spirits when he was observed in the early morning hours of September 14, 2015. (IV, p. 329). Later that same day, Plaintiff made a self-declared emergency ("SDE") but refused available treatment for an abrasion to the right knee. (*Id.*, p. 327). He also made an SDE request the following day for an unspecified medical condition but again refused treatment. (*Id.*, p. 326).

Notable to the matter at hand, on September 15, 2015, Lieutenant Wade Rigdon ("Rigdon") authored an email that was addressed to Dr. McVea, Stogner, and Kim Warner, Director of Mental Health at RCC. (III, p. 248). In that email, Rigdon recalled a conversation he previously had with Plaintiff on September 9, 2015 which began by Plaintiff explaining that "… he was going to remain restrained to the bed until he goes home." (*Id.*). Upon being asked by Rigdon "why he wanted to remain on extreme suicide watch he stated 'So I don't have to go to disciplinary court and they take my good time.'" (*Id.*). Plaintiff remained in one level or another of suicide watch through September 28, 2015. (IV, pp. 329, 324, 323, 322). In the interim, he had been seen at the RCC medical department on September 16, 2015 after making an emergency sick-call request for chest pain. (*Id.*, p. 325). Plaintiff's vital signs were in normal ranges, there was no exertion on speaking or breathing, and there was no

9

shortness of breath. (*Id.*). Those benign findings were provided to Dr. McVea who issued no treatment orders. (*Id.*).

The 280 pages of mental-health records that have been provided to the Court only serve to underscore the extensive nature of the care and treatment Plaintiff has received at RCC, with "Mental Health Individual Progress Notes" and "Mental Health Management Order[s]" being issued by a bevy of healthcare providers on a nearly daily basis, sometimes several times per day. Relevant to that matter at hand, those records reflect that Stogner had no role in Plaintiff's initial placement on suicide watch on September 3, 2015 and only became involved after he jumped from his toilet later in the day. (I, pp. 167, 168, 261-262). The following day, Plaintiff expressed anger to Stogner that she should be available to see him whenever he desired. (I, pp. 259-260). He also expressed anger about being written up for playing basketball two days earlier and professed an intention to go on a hunger strike. (*Id.*). After conducting a mental status examination and determining that Plaintiff was not a threat to himself or others, Stogner downgraded Plaintiff from ESW to SSW. (I, pp. 169, 259-260). Less than an hour later, Plaintiff was observed standing on his toilet threatening to jump. (I, pp. 257-258).

Plaintiff was still on ESW when he was first seen by Stogner on the morning of September 9, 2015. (I, pp. 250-251). He was upset with the write-ups he had received and with losing his duty status. (*Id.*). When Stogner saw him again at roughly midday, Plaintiff was calm, joked with Stogner about various issues, was able to distinguish between right and wrong, and exhibited no suicidal or homicidal ideations or actions. (I, pp. 248-249). Based upon the results of that mental status examination, Stogner downgraded Plaintiff from ESW to SSW. (I, pp. 171, 248-249). Just minutes later, as officers were attempting to get Plaintiff

10

up, he began ramming his head into the wall and was thus returned to ESW with a protective helmet. (I, pp. 172-246-247). Several hours later, Plaintiff was calm when he was seen again by Stogner and the headgear was thus removed. (I, pp. 173, 244-245).

By September 14, 2015, Plaintiff had ended his hunger strike and was calm, able to express his needs, knew the difference between right and wrong, was not threatening to harm himself, and was voicing no other suicidal or homicidal statements. (I, pp. 238-239). In light of those unremarkable mental-status examination findings, Stogner downgraded Plaintiff from ESW to SSW. (I, pp. 174, 238-239). It took all of 15 minutes before Plaintiff was observed jumping off the toilet onto the bed in his cell. (I, pp. 236-237). He was thus returned to ESW. (I, pp. 173, 236-237). Despite being on ESW, on the following day Plaintiff was seen banging his head on the bed and complained that he was being monitored too often. (I, pp. 234-235). Protective headgear was again employed. (I, pp. 176, 234-235). Plaintiff was evaluated later that day by Gamble who rendered a diagnosis of unspecified bipolar and other related disorders, cannabis use disorder, [6] malingering, and anti-social personality disorder. (I, pp. 12-13). In the days that followed, he was monitored closely by the mental-health staff on a continuing and regular basis. (I, pp. 184-233).

On September 23, 2015, Plaintiff offered to curtail his behavior sufficient to be taken off suicide watch if his disciplinary conviction was overturned, blaming Stogner and refusing to take responsibility for his actions. (I, pp. 212-213). On September 30, 2015, Plaintiff admitted to banging his head on the wall to insure that he remained on suicide watch and Stogner felt that the action was not a true attempt at self-harm but was simply voluntary

---

[6] Despite Plaintiff being incarcerated, the prison medical records contain numerous diagnoses of cannabis use disorder. (I, pp. 2, 3, 5, 7, 12-13, 14, 157-158, 159, 204).

behavior undertaken to prove a point. (I, pp. 206-207). On October 8, 2015, Plaintiff expressed that he was doing well and was tired of his medical classification, stating that "... he has been the one doing this and has control over his actions." (I, pp. 190-191). Suicide watch was thus discontinued and Plaintiff was placed on MHO. (I, pp. 182, 190-191). In the following days, Plaintiff expressed his dissatisfaction with that arrangement and on October 12, 2015, he expressed anger about Stogner <u>not</u> downgrading him further. (I, pp. 188-189, 186-187). On the orders of Stogner, Plaintiff was removed from MHO on October 13, 2015. (I, pp. 184-185, 183).

When interviewed by Gamble on October 29, 2015, Plaintiff was dismissive and threatening litigation. (I, p. 7). The diagnosis again included malingering with the external incentive being the avoidance of consequences for his actions. (*Id.*). Significantly, on November 16, 2015, Gamble authored a "To Whom It May Concern" note for inclusion in Plaintiff's chart, opining that Plaintiff's recent "acting out" behavior that were the grounds for disciplinary action were under his volitional control and were not motivated by a mental-health disorder despite the doctor's diagnosis. (I, p. 6). Plaintiff's mental-health treatment plan was updated on December 2, 2015. (I, pp. 157-158, 159-160). Mental-health care continued to be administered to him throughout the remainder of 2015 and into 2016.

The medical records summarized above constitute but a small portion of the voluminous records that have been provided to the Court. It is against the backdrop of those records, records upon which the Court may properly rely, *Gobert*, 463 F.3d at 346 n. 24,[7/] that the sufficiency of the allegations made by Plaintiff against the named Defendants be

---

[7/] "Medical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference." *Banuelos v. McFarland*, 41 F.3d 232, 235 (5th Cir. 1995).

analyzed. In order to establish a constitutional violation, Plaintiff must demonstrate that the Defendants were deliberately indifferent to his serious medical needs which constituted an unnecessary and wanton infliction of pain. *Wilson v. Seiter*, 501 U.S. 294, 297, 111 S.Ct. 2321, 2323 (1991). Deliberate indifference is an "extremely high" standard to meet, *Gobert*, 463 F.3d at 346, one that has been equated with "subjective recklessness" as that term is used in criminal law. *Norton v. Dimazana*, 122 F.3d 286, 291 (5th Cir. 1997). A prison official shows deliberate indifference if "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 1979 (1994).

"Unsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference, nor does a prisoner's disagreement with his medical treatment, absent exceptional circumstances." *Gobert*, 463 F.3d at 346 (footnote omitted). "An incorrect diagnosis by prison medical personnel [similarly] does not suffice to state a claim for deliberate indifference." *Domino v. Texas Dept. of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001)(citing *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985)). If an inmate in fact receives medical treatment, federal constitutional protections are not violated simply because that treatment was unsuccessful or because pain or other symptoms persist despite the treatment. *Gobert*, 463 F.3d at 345; *Williams v. Chief of Medical Operations, Forrest County Jail*, No. 94-10115, 1994 WL 733493 at *2 (5th Cir. Dec. 27, 1994); *Kron v. Tanner*, No. 10-CV-0518, 2010 WL 3199854 at *7 (E.D. La. May 19, 2010), *adopted*, 2010 WL 3171040 (E.D. La. Aug. 6, 2010). That an inmate's medical care "… may not have been the best money could buy" is insufficient to establish a constitutional violation, *Mayweather v. Foti*, 958 F.2d 91 (5th

13

Cir. 1992), and a prisoner is not entitled to medical treatment of his choosing simply upon request. *Stafford v. Kelly*, No. 09-CV-0133, 2011 WL 2633034 at *2 (N.D. Miss. June 3, 2011), *adopted*, 2011 WL 2633174 (N.D. Miss. July 5, 2011). Nor does the failure to provide a specialist in the field of an inmate's choosing state a claim for deliberate indifference. *Green v. McKaskle*, 788 F.2d 1116, 1127 (5th Cir. 1986).

As respects Gamble and Stogner, the medical records that have been provided to the Court fall far short of establishing the objective and subjective components needed to prevail on a claim of deliberate indifference. Plaintiff's primary argument in this matter is that he suffered injury to himself, at his own hands, as a result of Stogner downgrading him from ESW to SSW on three occasions. Putting aside the possibility that Plaintiff was guilty of something in the nature of comparative fault in bringing about harm to himself, *Davis v. Larpenter*, No. 15-CV-4414, 2015 WL 9999232 at *7 (E.D. La. Dec. 3, 2015), *adopted*, 2016 WL 430457 (E.D. La. Feb. 4, 2016), it is not entirely clear whether Plaintiff suffered any injuries as a result of the three occurrences that he complains of. Subsequent to the initial incident of September 3, 2015, which notably involved "no downgrading" by Stogner, five days elapsed before Plaintiff requested any medical treatment. Following an examination by medical personnel, no adverse objective findings were recorded and no treatment was prescribed. After reportedly banging his head on the wall on September 9, 2015, Plaintiff refused available medical care. Finally, Plaintiff claims to have sustained injury to his right side after he was downgraded by Stogner on September 14, 2015. Here, again, on that date Plaintiff refused available medical treatment for what was documented as an abrasion to his right knee and he again refused medical care after making an SDE on September 15, 2015. That Plaintiff either did not require, in the judgment of medical personnel, or refused

available medical care and treatment casts doubt on his allegations of having suffered anything more than *de miminis* injuries in any of these incidents.[8/] The Court also notes that despite being on ESW on September 15, 2015, Plaintiff was still able to engage in certain behavior that warranted him being fitted with protective headgear. And contrary to his present allegations that Stogner acted improperly by downgrading him on three occasions, the medical records reflect that on March 11, 2016, he specifically requested that his classification be downgraded and that he be removed from MHO. (III, p. 492). On yet another occasion, Plaintiff corresponded with the Assistant Warden asking for an explanation as to why he had been placed on suicide watch by Stogner even though he denied any suicidal intentions. (I, p. 22).

The foregoing notwithstanding, the fact that an inmate voices suicidal ideations or even engages in self-injurious behavior does not automatically render jail officials liable for any and all harm that follows. *See*, *e.g.*, *Hare v. City of Cornith, Miss.*, 135 F.3d 320, 328-29 (5th Cir. 1998). In *Domino*, for example, a prison psychiatrist was found to have made only an incorrect diagnosis, which is not actionable under §1983, with respect to the Plaintiff's potential for suicide in the face of the inmate's professed suicidal ideations and self-injurious behavior in the form of banging his head on a table in the doctor's presence. *Domino*, 239 F.3d 753-56. From a due-process perspective, insofar as inmates such as Plaintiff have no constitutional right to avoid being placed on suicide watch at all, it follows that they have no right to avoid being placed on a particular level of suicide watch. *Stewart v. Warner*, No. 13-

---

[8/] Indeed, in referring Plaintiff for outside consultation to determine his rehabilitation potential and for possible physical therapy on December 9, 2015, Dr. McVea described Plaintiff's medical history and physical findings relevant to the referral as status post gunshot wound to the right shoulder and neck with residual atrophy and weakness of the musculature of the right hand. (III, p. 179). No mention was made of any injuries resulting from the three incidents complained of by Plaintiff.

15

CV-4759, 2014 WL 3498165 at *5-6 (E.D. La. July 15, 2014)(and cases cited therein). More pertinent to the qualified-immunity defense raised by the Defendants, the decision to place Plaintiff on one level of suicide watch as opposed to another "… is a professional judgment appropriately left to mental health professionals …" *Id.* at *4. [9/]

Whether Stogner's downgrading of Plaintiff violated RCC's own policies is of no moment, *Samford v. Dretke*, 562 F.3d 674, 681 (5th Cir. 2009), and "[i]t has been consistently held that an inmate who has been examined by <u>medical</u> <u>personnel</u> fails to set forth a valid showing of deliberate indifference to serious medical needs." *Gillis v. Goodwin*, No. 13-CV-2506, 2015 WL 3622675 at *3 (W.D. La. June 9, 2015)(emphasis added); *Sneed v. Michaels*, No. 06-CV-0383, 2009 WL 722285 at *4-5 (W.D. La. Mar. 17, 2009)(treatment provided by nurses or other medical personnel is constitutionally sufficient). As for Plaintiff's complaint that Gamble's assessment of his mental state was flawed because it was based on responses elicited during an interview conducted via videoconference, "… disagreement with the diagnostic measures or methods of treatment afforded by prison officials does not state a claim for Eighth Amendment indifference to medical needs" *Id.* (citing *Norton*, 122 F.3d at 292).[10/] Brevity of the interview itself is also not dispositive. *Domino*, 239 F.3d at 756.

As noted by the Fifth Circuit, self-injurious behavior such as suicide is inherently difficult to predict, particularly in the depressing prison setting. *Domino*, 239 F.3d at 756. Where, as here, medical records establish that an inmate's condition was more than

---

[9/] Much like the decisions of prison officials respecting housing assignments and inmate classifications, *Hernandez v. Velasquez*, 522 F.3d 556, 562 (5th Cir. 2008), the Court is hardly in a position to second-guess the decisions of professional jail medical personnel where an inmate has admittedly been examined on numerous occasions. *Spears v. McCotter*, 766 F.2d 179, 181 (5th Cir. 1985).

[10/] As an aside, the Court notes that the Federal Rules of Criminal Procedure allow, albeit with the consent of a defendant, critical proceedings such as initial appearances and arraignments to be conducted via teleconferencing. Rules 5(f), 10(c), Fed. R. Cr. P.

reasonably monitored by qualified mental-health professionals, the Court is ill-suited to second-guess decisions regarding the efficacy of that care, decisions that are often made in response to rapidly changing events and circumstances as Plaintiff's medical records demonstrate. In short, the determinative issue is not whether the mental-health care that Plaintiff received was substandard in some respect, whether medical problems were misdiagnosed or persisted, or whether he was dissatisfied with his care; rather, it is only whether his serious medical needs were met with deliberate indifference by Gamble and Stogner. On the voluminous record before it, the Court easily answers that question in the negative as Plaintiff's allegations "… address [more] the nature of his treatment and not the lack thereof." *Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir. 1991). Finally, as for Plaintiff's allegation of being deprived of a mattress in his cell during daytime hours while housed in disciplinary segregation, the Fifth Circuit and other courts have concluded that such does not rise to the level of a constitutional violation. *Alex v. Stalder*, 225 Fed.Appx. 313 (5th Cir. 2007); *Hadwin v. Stalder*, 196 Fed.Appx. 293, 294 (5th Cir. 2006); *Stewart*, 2014 WL 3498165 at *7.

The second group of allegations raised by Plaintiff's complaint centers on the validity of the disciplinary proceedings that went forward against him on September 17, 2015. Despite Plaintiff's best efforts to minimize its significance (*see* note 2, *supra*), he admits that he lost 540 days of good time credits as a result of the disciplinary conviction. By way of the present lawsuit, Plaintiff alleges that he was incompetent to be subjected to such disciplinary proceedings in the first instance, that he was wrongfully denied a continuance of those proceedings, and that he was deprived of fair notice and an opportunity to defend himself

from such proceedings.[11]/ For the Court to rule in favor of Plaintiff on any or all of those allegations, it would necessarily imply the invalidity of his otherwise undisturbed disciplinary conviction.

As explained by the Fifth Circuit sitting en banc in *Clarke v. Stalder*, 154 F.3d 186, 189 (5th Cir. 1998)(en banc), *cert. denied*, 525 U.S. 1121, 119 S.Ct. 1052 (1999), "[a] prisoner … cannot bring a §1983 action seeking damages … based on a 'conviction' until that 'conviction' has been … declared invalid … if a favorable judgment would 'necessarily imply' the invalidity of the prisoner's 'conviction' …" *Id.* (citing *Heck v. Humphrey*, 512 U.S. 477, 486-87, 114 S.Ct. 2364, 2372 (1994)). "A 'conviction,' for purposes of *Heck*, includes a ruling in a prison disciplinary proceeding that results in a change to the prisoner's sentence, including the loss of good-time credits." *Id.* (citing *Edwards v. Balisok*, 520 U.S. 641, 644, 117 S.Ct. 1584, 1587 (1997)). As Plaintiff's disciplinary conviction remains unassailed, he may not use §1983 to collaterally attack the hearing's validity or the conduct underlying the disciplinary conviction. *Jackson v. Mizzel*, 361 Fed.Appx. 622, 625 (5th Cir. 2010); *Chavis v. Zodlow*, 128 Fed.Appx. 800, 804 n. 5 (2nd Cir. 2005); *Beckham v. Keaton*, No. 14-CV-0159, 2015 WL 1061597 at *6 (E.D. Kent. Mar. 10, 2015); *Troquille v. Thomas*, No. 08-CV-0758, 2009 WL 3112141 at *3-4 (E.D. La. Sept. 25, 2009). For all these reasons, it will be recommended that Defendant's motion be granted and that Plaintiff's suit be dismissed.

## **RECOMMENDATION**

For the foregoing reasons, it is recommended that Defendants' Rule 12(b)(6) motion be granted and that Plaintiff's suit be dismissed.

---

[11]/ The pleadings submitted by Plaintiff in this case do not on their face evince illiteracy or incompetency. *McKoy v. Cox*, 587 Fed.Appx. 802, 804 (5th Cir. 2014); *Miskovsky v. Parker*, No. 15-CV-1436, 2007 WL 4563671 at *19 (W.D. Okla. Dec. 21, 2007), *cert. of app. denied*, 285 Fed.Appx. 570 (10th Cir. 2008).

18

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within 14 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. *Douglass v. United States Auto. Assoc.*, 79 F.3d 1415 (5th Cir. 1996)(en banc).[12]

New Orleans, Louisiana, this  24th  day of          April          , 2017.

_____
MICHAEL B. NORTH
UNITED STATES MAGISTRATE JUDGE

---

[12] *Douglass* referenced the previously-applicable 10-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. §636(b)(1) was amended to extend that period to 14 days.

19